COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Haley and Senior Judge Annunziata
Argued at Alexandria, Virginia


WARREN P. DENISE

v.      Record No. 1833-04-4

PHILIP C. TENCER                                         OPINION BY
                                              JUDGE ROSEMARIE ANNUNZIATA
PHILIP C. TENCER                                         AUGUST 16, 2005

v.      Record No. 1878-04-4

WARREN P. DENISE


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                            Dennis J. Smith, Judge

            Gregory L. Murphy (Melissa M. Nichols; Stacey L. Papp; Vorys
            Sater Seymour & Pease LLP, on briefs), for Warren P. Denise.

            James Ray Cottrell (Christopher W. Schinstock; Gannon & Cottrell,
            P.C., on briefs), for Philip C. Tencer.


        Warren P. Denise (grandfather) appeals the trial court's decision awarding primary

physical custody of his minor granddaughter (the child) to the child's biological father, Philip C.

Tencer (father).  Grandfather contends the trial court abused its discretion by:  (1) finding a

material change in circumstances had occurred; (2) finding it in the child's best interests to

award physical custody to father; and (3) making certain evidentiary rulings.

        Father cross-appeals, presenting five questions that he addressed in four arguments.  In

his first three arguments, father contends the trial court violated his rights under the Due Process

Clauses of the United States and Virginia Constitutions by continuing joint legal custody in him

and grandfather and by failing to award him sole legal custody of his child.  In these arguments,

he takes issue with the trial court's procedures, interpretations, and application of the law relating to a South Carolina order and agreement and his constitutionally protected liberty interest and child-rearing autonomy.

In his fourth argument, father asserts the trial court's decision to continue joint legal custody lacks sufficient evidence to support it. He argues that his fitness as a parent and grandfather's lack of cooperation regarding the South Carolina order required a different result.

We affirm the trial court's decision.

BACKGROUND

On August 29, 1997, Mary A. Denise (mother) gave birth to the child. She cared for and maintained physical custody of the child until her death on September 6, 2001 from terminal breast cancer, a diagnosis she received in July 1999. At these times, father was married to his present wife, Laura Tencer.[1] Father has never been married to the child's mother.

In 2001, while residing in South Carolina, the child's mother filed a petition in the Richland County, South Carolina family court to terminate father's parental rights. Grandfather was present at the hearing held on February 23, 2001, and "moved to be included as a party to this action." As reflected in the order, "Both parties and the guardian *ad litem* consented to his inclusion as a party, and [grandfather] consented to the jurisdiction of the court. He is a full participant to the terms of this settlement agreement." In its findings of fact and conclusions of law, the family court found that grandfather "should be and is hereby made a party to this action with the same rights, responsibilities, and obligations as any other party." The order further

---

[1] The record showed that Laura and Philip Tencer were married in August 1991. They have two daughters born in September 1994 and May 1996. Father's wife testified that she and father discussed separating in November 1996 and actually separated in June 1997. According to her, the couple reconciled in August or September 1998.

Father testified that he and the child's mother worked at the same law firm in California. After she became pregnant, she moved to Virginia and father remained in California with his wife.

reflected that the parties had entered an agreement "which resolved all matters arising from this action and addresses the impending custody matters which are expected to arise in the near future." It incorporated the terms of the agreement in its order, providing, *inter alia*:

> [Mother] shall remain the custodial parent of [the child] until her death with liberal visitation accorded [father]; the schedule to be agreed upon by [mother] and [father]. Upon the death of [mother], the parties have agreed to a joint custody arrangement for the minor child with the minor child primarily residing with [grandfather] and the goal to unite the minor child and [father] as is set forth in the attached agreement.

The family court judge also made and included in the order the following findings of fact:

> [A]ll three parties have fully read the attached Agreement, believed the Agreement to be fair, and desired that the Agreement be approved by the Court. Furthermore, counsel for the parties represented that the Agreement had been negotiated over a period of several days with each party having an opportunity to review the Agreement with his or her counsel prior to . . . signing it . . . .

The family court judge dismissed with prejudice mother's action to terminate father's parental rights, finding that all parties freely and voluntarily entered into the agreement without duress or coercion and that "all of the parties have waived their right to a trial and desire that the Court approve the Agreement."[2]

On December 12, 2001, shortly after mother died, father filed a motion and petition in the Fairfax County Juvenile and Domestic Relations District Court, the first of several motions and

---

[2] The one-page agreement, which the court incorporated into its order, provided, in pertinent part, for "[j]oint custody between [grandfather] and [father], with [the child's] primary residence with [grandfather] in Virginia and [father] having liberal contact with [the child] with the goal of uniting [the child] and [father]." The parties agreed to "seek the advice and counsel of an independent professional to assist them to deal with the grief and trauma" associated with mother's death and "to utilize this professional to assist them to make decisions about [the child's] future including the implementation of this Agreement." Under the agreement, "[e]ach party shall have the right to seek relief in the Family Court" in case either party fails to participate in the process or implement the agreement or "has an honest difference of opinion with recommendations of the independent professional."

petitions seeking court intervention in the visitation and custody dispute between him and grandfather. At that time, the child was living with grandfather in Fairfax.

In his motion, father requested that the child be permitted to visit him in California in December 2001 and to vacation with his family in Utah in February 2002. In his petition, father alleged that the child "is a child whose custody and visitation require determination pursuant to" the February 23, 2001 South Carolina family court order. The juvenile court denied father's request that the child be allowed to visit with him and his family during December 2001; however, it granted his motion to allow the child to vacation with the family in February 2002.

On January 2, 2002, father filed another petition in the juvenile court, this time seeking physical custody of the child. Before a hearing could be held, grandfather filed a petition in the Fairfax juvenile court seeking primary physical and sole legal custody of the child.

In response to the parties' petitions, the juvenile court entered a consent order on June 9, 2003,[3] declaring that father and grandfather "represented that they have reached an agreement related to the custody and visitation of [the child]." Finding that the order is in the child's best interests, the juvenile court decreed that father and grandfather "shall retain joint legal custody of the minor child, with physical custody and the primary physical residence of [the child] remaining with [grandfather]." The order outlined the responsibilities and rights of the parties, and father's visitation schedule with the child during the summer, Christmas vacation, and spring break. The order also required the parties to cooperate and communicate frequently.

Father subsequently appealed the juvenile court's June 9, 2003 order to the Fairfax County circuit court. After a seven-day *ore tenus* hearing during which the trial court received

---

[3] From February 2002 until June 2003, the juvenile court conducted several status hearings, supervised the parties, addressed the many issues raised by the parties regarding visitation with the child, and directed communications between the parties and the experts who were to provide assistance to the juvenile court in making its determinations.

and considered extensive testimonial and documentary evidence, including transcripts, reports, evaluations, and depositions, it entered an order on July 9, 2004 finding that a material change of circumstances had occurred since February 2001.  It specifically noted that

> Mother [had] died . . . and [that] the relationship between [father] and [the child] is significantly more developed than it was in February 2001.  [The child] is older.  She's beginning the first grade in the fall and her situation has changed . . . she's developed a relationship with [father's] family which she did not have in 2001.

The trial court also concluded that the plan for uniting the child with her father and which had been incorporated into the South Carolina and Fairfax juvenile court orders,[4] had proved difficult, if not impossible, to implement as contemplated.  Among the difficulties in implementation identified by the trial court was the failure of both the order and agreement to clearly define the role of the various "players," an omission that had led to inconsistent interpretations and implementation of the provisions by all involved, including the child's guardian *ad litem* and her individual therapist.  Notably, the trial judge commented that "the professionals became the decision-makers [acting in the stead of] the father and the grandfather," frustrating the intent of the agreement "by not allowing the father and the grandfather to develop the relationship . . . they needed [in order] to be able to form a working partnership in arriving at joint decisions for the best interests of [the child]."  The court found the result both untenable and unintended under the agreement.

Notwithstanding the changes in circumstances found to have occurred, the trial court rejected father's contention that they warranted a change in the legal custodial arrangements.  It identified the following factors as bearing significantly on its resolution of the question:  the

---

[4] On October 25, 2001, grandfather filed certified copies of the South Carolina order and the agreement with the Fairfax juvenile court, thus domesticating the order with its incorporated agreement.

relationship that the child had developed with father, his wife, and family; the failures associated with the implementation of the South Carolina order and agreement as set forth, *supra*; the several frustrated attempts by father to have visitation with the child; and the child's continuing inability to "change [her] attachment from the grandfather to her father." The trial court found that the latter problem was caused, in part, by the "continuing effect on the grandfather of [mother's] death" and the circumstances in grandfather's household which "in some ways . . . prevented [the child] from moving on." The trial judge further found that grandfather "has not actively supported the contact and relationship with [father] as [well as] he could have."

That said, the trial judge determined that, while father had an understanding of the child's needs, grandfather's understanding of those needs was better because he was with her on a daily basis. The court referred to grandfather as the "person who [the child] turns to, and . . . [grandfather] fulfills those needs."

Based on these findings, the trial court determined that the material changes in circumstances found to have occurred did not warrant a modification of the joint legal custodial arrangement. It, therefore, denied father's motion for sole legal custody and continued joint legal custody between him and grandfather. The court's resolution of the issues was based on its application of the best interests of the child standard and its conclusion that father had waived the rights accorded him as a parent under the United States Constitution.[5]

With respect to father's petition for sole physical custody, the trial court found that father's relationship with the child "is at a plateau and it can't go any further unless the child

---

[5] The trial court explained:

> With regard to the "best interests" standard in looking at the other situation, I don't believe it would foster [the child's] best interests at this point for [father] to have sole legal custody . . . [because] [grandfather] has a better understanding of her needs at this point and should have . . . an equal input into what occurs.

- 6 -

lives with him" and that it was in the child's best interests to award primary physical custody to him. Grandfather's appeal and father's cross-appeal followed.

## THE ISSUES

Father argues on appeal that the trial court committed reversible error in refusing to grant him sole legal custody. His principal contention is that the trial court applied an incorrect legal standard in deciding the child's legal custody in this case. Father asserts the trial court improperly considered and relied on the South Carolina order and agreement in determining the standard of review. As a result, he contends the trial court erroneously deprived him of certain rights guaranteed to him as a parent under the United States Constitution[6] and disregarded the legal standard established in Troxel v. Granville, 530 U.S. 57 (2000). Father also contends that the evidence does not support the trial court's denial of his petition for sole legal custody.

In his appeal, grandfather challenges the award of primary physical custody to the father on the ground the evidence is insufficient to support the decision. He also challenges the propriety of certain evidentiary rulings, claiming they were erroneous and prejudicial to his case. We address each party's claim in turn.

## FATHER'S ARGUMENTS

### I. The Proper Legal Standard to Apply

Citing Troxel v. Granville, 530 U.S. 57 (2000); Williams v. Williams, 256 Va. 19, 501 S.E.2d 417 (1998); and Griffin v. Griffin, 41 Va. App. 77, 581 S.E.2d 899 (2003), as primary authorities, father argues that the trial court's decision awarding grandfather joint legal custody

---

[6] Although father also argued in his brief a violation of Virginia's Constitution, he failed to demonstrate that he made that argument below. The record shows that father objected to the trial court's order solely "on the basis of his fundamental liberty interest under the U.S. Constitution." In other stated exceptions, father failed to state what constitution he was relying on in arguing in favor of his "constitutionally protected liberty interest" to rear his own child. Therefore, we limit our analysis to those protections afforded under the United States Constitution, the only one specified pursuant to Rule 5A:20(c).

"in a decree separate from the South Carolina Order contravenes the Father's constitutionally protected fundamental liberty interest under the Fourteenth Amendment to the Constitution of the United States to raise his daughter without interference from a third party or the state, absent clear and convincing evidence that he is unfit." Father summarizes his argument as follows:

> For the trial court to have completely denied the Father's request for sole custody of [the child], therefore, it must have found that by clear and convincing evidence that the Father is an unfit parent, that [the child] will suffer "actual harm" if she did not visit, let alone live with the Grandfather.

To be sure, grandfather failed to either allege or prove father's unfitness. However, we find that father's reliance on Troxel, Williams, and Griffin is misplaced, and we find no error in the trial court's denial of father's petition to place sole legal custody of the child in him.

### A. Troxel v. Granville

In Troxel, the Supreme Court examined and discussed a parent's constitutional right in the context of a dispute between the child's parents and a third party, namely, the child's grandparents. A Washington statute, which provided that "'[a]ny person may petition the court for visitation rights at any time,'" was at issue. Troxel, 530 U.S. at 61. It authorized the court to "order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.'" Id. Although never married, Troxel's son and Granville had two daughters together. Id. at 60. They separated in 1991 and, in 1993, Troxel's son committed suicide. Id. Five months after the suicide, Granville sought to limit visitation for the paternal grandparents, Jenifer and Gary Troxel. Id. at 60-61. The trial court granted the Troxels' petition for visitation pursuant to the Washington visitation statute. Id. at 61. On appeal, the Washington Supreme Court found the statute facially unconstitutional, effectively striking it down. Id. at 63.

- 8 -

Discussing the propriety of governmental intrusions into the parent-child relationship, Justice O'Connor, writing for a plurality of four justices, underscored the historical roots of the fundamental principles at issue. See id. at 65-66. The Court recognized that "the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court." Id. at 65, 66 (citing prior United States Supreme Court precedent recognizing the fundamental right of parents to make decisions concerning the care, custody, and control of their children). It also allied that fundamental liberty interest to the presumption that a fit parent will act in the best interest of the child. Id. at 68 (citing Parham v. J.R., 442 U.S. 584, 602 (1979)).

Moving from principle to practice, Justice O'Conner noted that the trial court's "'commonsensical'" conclusion that it "'is normally in the best interest of the children to spend quality time with the grandparent'" unless there is proof that such contact would adversely affect the children incorrectly accorded the grandparents a presumption in their favor and "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." Id. at 69. A presumption favoring the grandparent's right to visitation failed to protect the parent's fundamental constitutional right to make decisions concerning the rearing of her children. Id. at 69-70.[7] Such was the fundamental infirmity of the statute:

> Once the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded no deference. Section 26.10.160(3) contains no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the judge.

---

[7] The Court cited the case of Hoff v. Berg, 595 N.W.2d 285 (N.D. 1999), to further elucidate the point. In Hoff, the North Dakota Supreme Court held that its grandparent visitation statute was unconstitutional because, given the presumption in favor of the grandfather, the state by its statute "forc[ed] parents to accede to court-ordered grandparental visitation unless the parents are first able to prove such visitation is not in the best interests of their minor child." 595 N.W.2d at 291-92.

> Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests.

Id. at 67.

Beyond the articulation of the fundamental constitutional principle at issue, the United States Supreme Court's decision in Troxel is limited to the specific due process infirmities of the Washington statute; it left to the state courts the task of developing the law to be applied in resolving child custody and visitation disputes between a parent and third party.[8] That said, the overarching analytical principle that derives from Troxel and its progeny can be identified as focused on the need to determine and apply the correct burden of proof in light of the presumption that a fit parent acts in the best interest of the child.

## B.  Williams v. Williams

In Williams v. Williams, 256 Va. 19, 501 S.E.2d 417 (1998), the Virginia Supreme Court had earlier examined and reaffirmed a parent's fundamental right to care for and make decisions regarding his or her child.  There, the paternal grandparents filed a petition pursuant to Code § 20-124.2(B) seeking visitation with their granddaughter after the child's mother and father

---

[8] The New Jersey Supreme Court has observed that

> [c]ourts across the country have wrestled with the issue of grandparent visitation both before and after Troxel.  In general, they have engaged in one of two modes of analysis: (1) interpreting the statutes to require satisfaction of a harm standard in order to overcome the presumption in favor of a fit parent's decision or (2) avoiding the articulation of any standard at all and analyzing the statutes on a case-by-case basis.

Moriarty v. Brandt, 827 A.2d 203, 218 (N.J. 2003) (explaining that "Troxel implied that either approach would be acceptable").

refused to allow them further visitation with the child. The child's parents lived together, and no allegations of parental unfitness were proffered or established. Id. at 20, 501 S.E.2d at 417. The trial court found "that the child's best interests would be served by having visitation with her grandparents" and ordered visitation against the wishes of both parents. Id. at 21, 501 S.E.2d at 417. The parents appealed, arguing "that Code § 20-124.2(B), as it pertains to nonparent visitation, interferes with their right to autonomy in child rearing and, hence, violates the Fourteenth Amendment to the United States Constitution." Id.

On appeal to this Court, we recognized that "the right of the parents in raising their children is a fundamental right recognized by the Fourteenth Amendment," and "[s]tate interference with a fundamental right must be justified by a 'compelling state interest.'" Williams v. Williams, 24 Va. App. 778, 783, 485 S.E.2d 651, 654 (1997) (explaining that protecting a child's health or welfare is a recognized compelling state interest), modified and affirmed on appeal, 256 Va. 19, 501 S.E.2d 417 (1998). Thus, we held that the burden of proof required to support a court's award of visitation with a grandparent over the parent's objection is one of "actual harm." Id. at 784-85, 485 S.E.2d at 654.

> For the constitutional requirement to be satisfied, before visitation can be ordered over the objection of the child's parents, a court must find an actual harm to the child's health or welfare without such visitation.
>
> The "best interests" standard is considered in determining visitation only *after* a finding of harm if visitation is not ordered. Without a finding of harm to the child, a court may not impose its subjective notions of "best interests of the child" over the united objection of the child's parents without violating the constitutional rights of those parents. In this regard, the parents' constitutional rights take precedence over the "best interests" of the child.

Id. We reversed and remanded for the trial court to give proper deference to the parental presumption.[9]

## C. Griffin v. Griffin

Two years ago, we decided Griffin v. Griffin, 41 Va. App. 77, 581 S.E.2d 899 (2003). There, Andrea Griffin, wife of Elbert Griffin, conceived and gave birth to a child while they were separated. Id. at 79-80, 581 S.E.2d at 900. Husband believed he was the child's father and treated the child as his own. Id. at 80, 581 S.E.2d at 900. Wife and the child lived with wife's mother but allowed husband weekly visitation with the child. Id. A short time later, a paternity test established that husband was not the child's father. Id. Upon learning the results of the paternity test, wife denied him further visitation. Id. The biological father paid child support, but he was not involved with the child, and he did not request that husband obtain visitation. Id. The trial court held for husband, "stating that the 'best interests' of the child would be served by ordering visitation over the mother's objection and that not doing so would be 'detrimental' to the child." Id. at 81-82, 581 S.E.2d at 901.

Reciting the rule explained in Williams, "when fit parents object to non-parental visitation, a trial court should apply 'the "best interests" standard in determining visitation *only after* it finds harm if visitation is not ordered,'" Griffin, 41 Va. App. at 83, 581 S.E.2d at 902 (quoting Williams, 24 Va. App. at 784-85, 485 S.E.2d at 654), we reversed the trial court, holding there was no clear and convincing evidence of "actual harm" as required by Williams. Id. at 85-86, 581 S.E.2d at 903 (explaining that "the trial court collapsed the two legal standards

---

[9] The Virginia Supreme Court affirmed our decision and likewise reversed the trial court decision; however, it decided to dismiss the proceeding rather than remand it, after determining there was no evidence that the child would be harmed if visitation were not ordered. Williams, 256 Va. at 22, 501 S.E.2d at 418.

together," and "treated the actual-harm requirement as simply a restatement of the best-interests test").

## II. Analysis

As these decisions make manifest, while parental rights have long been recognized under the common law, historically, grandparents have not enjoyed similar preferential treatment. See Troxel, 530 U.S. at 96-97 (Kennedy, J. dissenting) (generally, "contemporary state-court decisions acknowledge that '[h]istorically, grandparents had no legal right of visitation,' and it is safe to assume other third parties would have fared no better in court"); see also Linder v. Linder, 72 S.W.3d 841, 855 (Ark. 2002) ("[G]randparental visitation has no historic roots in the common law but rather is a legislated creature of the late twentieth century"; listing other state cases stating the same fact.). Therefore, grandparents generally come before the court merely as a "'Person with a legitimate interest.'" Code § 20-124.1 (defining and listing examples of persons other than fit natural parents who are considered persons with a legitimate interest).

However, it surely does not follow that rights analogous to the constitutional rights enjoyed by a parent may not be established by other means, the most salient of which are court-adjudicated findings that a non-parental actor, such as a grandparent, is acting and will continue to act in accordance with the best interests of the child and that the non-parental party is a proper custodian. Were that not the case, adoptive parents, relatives, and other non-parental third parties, including the state, could not be found proper parties to whom an award of custody may be made.

We conclude that the decisions in Troxel, Williams, and Griffin are inapposite and do not support father's argument because they involved situations in which a non-parent with no custodial rights requested visitation against the wishes of parents whose constitutional right to child-rearing autonomy had not been in the least altered. Troxel did not address the factual

- 13 -

circumstance that confronted the trial court here. Moreover, to apply the Troxel parental presumption in this case, where grandfather shared joint legal custody with the father and had sole or primary physical custody, not only disregards the factual distinctions that exist, but also renders the principle of custody and the status of custodian meaningless.[10]

Two Virginia Supreme Court cases, albeit decided prior to Troxel, support the conclusion that the trial court applied the correct legal principles in this case. In McEntire v. Redfearn, 217 Va. 313, 227 S.E.2d 741 (1976),[11] a mother and her two children (born in 1968 and 1969) resided with the maternal grandmother until the mother died in 1971. Id. at 313-14, 227 S.E.2d at 742. The children's father "who lived elsewhere, had failed to support the children until he was required to pay [child support] by a court order entered shortly before the mother's death." Id. at 314, 227 S.E.2d at 743.

> In a custody proceeding during August 1971 the Alexandria juvenile court ordered, after a hearing on the merits at which the father was present, that custody of the two children "be assumed by the Court and [that they be] temporarily placed with [the grandmother]." No appeal was taken by the father from that action in juvenile court.

Id. at 314, 227 S.E.2d at 742.

Four years later, in 1975, the father filed a petition in juvenile court seeking custody of the children. Id. at 313, 227 S.E.2d at 742. The juvenile court awarded custody to the father, as did the trial court on appeal by the grandmother. Id. at 314, 227 S.E.2d at 742. The trial court

---

[10] "'Joint custody' means joint legal custody where both parents retain joint responsibility for the care and control of the child and joint authority to make decisions concerning the child even though the child's primary residence may be with only one parent . . . ." Code § 20-124.1. "'Sole custody' means that one person retains responsibility for the care and control of a child and has primary authority to make decisions concerning the child." Id. See also Code § 16.1-228 (defining "'Legal custody'" as, *inter alia*, "a legal status created by court order").

[11] McEntire was cited by the trial court in its June 11, 2004 opinion letter to support its conclusion that father "knowingly waived the constitutional presumption to which he was entitled as the sole surviving biological parent of [the child]."

"ruled the grandmother had the burden of proving by clear and convincing evidence that the father was unfit and that the best interests of the children would be promoted by granting custody to the grandmother." Id.

Relying on its earlier decision in Dyer v. Howell, 212 Va. 453, 184 S.E.2d 789 (1971), the Supreme Court held that the trial court ascribed and employed the wrong burden of proof. McEntire, 217 Va. at 315, 227 S.E.2d at 743.[12] The Court explained its decision, as follows:

> [M]ore than four years before the father instituted the present proceeding, the juvenile court, after a hearing at which the father was present, made an unappealed adjudication that custody should be assumed by the Court to the exclusion of the father. This order was a determination by a court of competent jurisdiction of the custody question on its merits based upon then-existing facts. The order further provided for temporary placement of the children with the grandmother. *Consequently, the father here, like the father in Dyer, when he instituted the present proceeding, was not clothed with the parental presumption generally accorded natural parents in a dispute with non-parents, because his parental custody rights were altered by the 1971 order.* We hold, therefore, that in this proceeding the welfare of these children is the paramount consideration, and that the burden was upon the father to prove the circumstances had so changed since the 1971 order that it would be in the children's best interests to transfer custody to him.

Id. at 315-16, 227 S.E.2d at 743 (emphasis added).

Two months after its decision in McEntire, the Virginia Supreme Court decided Watson v. Shepard, 217 Va. 538, 229 S.E.2d 897 (1976), a case involving a custody dispute between the natural mother and paternal relatives who were seeking to adopt the child. In Watson, the mother had executed a notarized statement which stated, "'I give my consent for [the Shepards, the child's paternal aunt and the aunt's husband] to have custody of [my] daughter . . . .'" Id. at 540, 229 S.E.2d at 898. The mother explained that she was unable to properly care for the child

---

[12] Although McEntire was a pre-Troxel case, we find it still viable and its principles applicable because the facts and circumstances there and in this case are distinguishable from Troxel and, thus, do not require application of Troxel and our case law applying it.

- 15 -

at the time and felt the child "'would be better off with [the Shepards] . . . until I could get myself straightened out.'" Id. at 539-40, 229 S.E.2d at 898. After hearing evidence, including testimony from a juvenile court officer that the mother said "'she expected to try to regain the custody when she settled down,'" the juvenile court entered an order awarding the Shepards custody and granting the parents reasonable visitation. Id. at 540-41, 229 S.E.2d at 899. Two years later, the mother petitioned to regain custody of her child. At the hearing on the petition, the Shepards expressed a desire to adopt the child. Id. at 542-43, 229 S.E.2d at 900. The trial court "found 'it is in the best interests of the said child that she remain in the custody of the said Shepards.'" Id. at 544, 229 S.E.2d at 901. As to the Shepards' adoption petition, the trial court found that the mother "'is not a fit person to have the custody of the said infant child; and that it is in the best interests of the [child] that she be adopted by [the Shepards].'" Id. The Virginia Supreme Court upheld the trial court's decision to apply a best interests test and its decision denying custody to the mother. Id. Regarding the adoption request, the Supreme Court reversed the trial court's decision, which granted the Shepards' request to adopt. Id. As to custody, the Court reasoned:

> [The] juvenile court order relieved the mother of [the child's]
> custody and awarded her custody to the Shepards. That order was
> not merely *pro forma*, as the mother now contends, but it was
> based upon her voluntary relinquishment of custody, as evidenced
> by a written statement executed by her, upon results of a thorough
> investigation, and upon a hearing by a court of competent
> jurisdiction at which the report of investigation was considered and
> the evidence heard. *Consequently, the mother's parental custody
> rights were altered and for her to be entitled to a later change in
> custody, the burden was upon her to show the circumstances had
> so changed since entry of the foregoing order that it would be in
> [the child's] best interests to transfer custody to her; the burden*

- 16 -

> *was not upon the Shepards, as the mother argues, to show parental unfitness.*

Id. at 544-45, 229 S.E.2d at 901 (emphasis added).[13]

We perceive no principled basis for reaching a different result here. Father twice consented, by court order, to place primary physical custody and joint legal custody in grandfather: once in South Carolina and again in a consent order filed in the Fairfax juvenile court. Presumptively acting in the child's best interests, the father agreed that the child's best interests were served by placing custody in grandfather. He also implicitly and necessarily agreed that grandfather, as custodian, was acting and would continue to act in the child's best

---

[13] Similarly, this Court has not uniformly applied the standard enunciated in Troxel in every custody dispute between a parent and grandparent. In cases that fall beyond the parameters of Troxel factually, we have reasoned that a different burden of proof may properly be applied. For example, in Dotson v. Hylton, 29 Va. App. 635, 513 S.E.2d 901 (1999), mother was awarded sole physical custody and joint legal custody of the child, which she shared with her divorced husband. Id. at 637, 513 S.E.2d at 902. The father was later incarcerated, at which time the mother petitioned for sole physical custody, however, the father requested "reasonable visitation" for him and the paternal grandmother. Id. "[T]he trial court granted the mother sole custody of the child[, and] specifically found that denial of visitation with the father and grandmother would not be in the best interests of the child." Id. at 638, 513 S.E.2d at 903. On appeal, we upheld the visitation award, explaining that the Williams standard does not apply when one parent objects to visitation and the other parent requests it. Id. at 639, 513 S.E.2d at 903.

Subsequently, in Yopp v. Hodges, 43 Va. App. 427, 598 S.E.2d 760 (2004), the mother of a child denied the maternal grandparents visitation with the grandchild. Id. at 431, 598 S.E.2d at 762. The grandparents petitioned the court for visitation. Id. The child's natural father who had no contact with the child "expressly requested that the maternal grandparents be given visitation rights." Id. at 432, 598 S.E.2d at 762. The trial court found that visitation with the grandparents "'would be in the child's best interest,'" and it granted the maternal grandparents' petition. Id. at 432, 598 S.E.2d at 763. We distinguished the holding in Williams and Troxel and held:

> The standard enunciated in Dotson applies here because father expressly supported the maternal grandparents' request for visitation with the child and the mother has never asserted, and does not now assert, that father is an unfit parent who should be deemed legally incapable of participating in parental decision making.

Yopp, 43 Va. App. at 438, 598 S.E.2d at 765.

interests. The subsequent court order confirmed that factual conclusion. Thus, while grandfather is not accorded a constitutionally-derived legal presumption that he will act in the best interest of the child and is thus a proper custodian, he was vested with custodial status and all its attendant legal attributes by the father's agreement embodied in two court orders. See Lindsay v. Lindsay, 218 Va. 599, 602-04, 238 S.E.2d 817, 819 (1977) (consent order was contractual modification and binding upon the parties (citing Durrett v. Durrett, 204 Va. 59, 63, 129 S.E.2d 50, 53 (1963))).

As a matter of legal definition and fact, according grandfather the status of custodian gave him precisely the same child-rearing autonomy as that enjoyed by a parent. As the child's legal custodian, grandfather was vested with the "right to have physical custody of the child, to determine and redetermine where and with whom [the child] shall live, the right and duty to protect, train and discipline [the child] and to provide [the child] with food, shelter, education and ordinary medical care . . . ." Code § 16.1-228. There is nothing in our jurisprudence that supports the conclusion that legal and/or physical custody placed in a non-parent is subject to diminished protection under the law, simply because the individual seeking modification of that status is the child's parent. See McEntire, 217 Va. at 315-16, 227 S.E.2d at 743 (father was not clothed with parental presumption after court of competent jurisdiction made a judicial determination reflected in valid order); Albert v. Ramirez, 45 Va. App. 799, 807-09, 613 S.E.2d 865, 868-70 (2005) (natural mother was not entitled to Troxel and Williams presumption in her motion to modify custody and visitation where juvenile court entered valid consent decree providing stepfather with joint custody).[14]

---

[14] Additionally, the trial court in Fairfax approved the agreement. See Albert, 45 Va. App. at 807-08, 613 S.E.2d at 869 (discussing binding nature of valid consent decree).

We conclude that the trial court properly applied the best interests test to determine the child's custody in this case. Where father is no longer "clothed with the parental presumption generally accorded natural parents in a dispute with non-parents, . . . it follows that the best interests test is appropriately applied in resolving the custody dispute between father and grandparent." McEntire, 217 Va. at 316, 227 S.E.2d at 743[15]; see also Watson, 217 Va. at 544, 229 S.E.2d at 901; Dyer, 212 Va. at 456, 184 S.E.2d at 792. We, furthermore, perceive nothing in Troxel that compels a different result. Despite the Supreme Court's clear and broad articulation of the constitutional rights at issue in such dispute, the opinion in Troxel is limited in nature. The plurality rested its "decision on the sweeping breadth of [the Washington statute] and the application of that broad, unlimited power in this case," and it declined to prescribe the degree of deference or define the standard of review required before a non-parent could obtain visitation or custody. 530 U.S. at 73. Clearly, Troxel did not define the burden of proof to be applied or the factors to be established and considered when the court is faced with a custody dispute between a grandparent and a parent, both of whom have custodial rights. Thus, the results are the same, whether we denominate father's agreement, as embodied in the court orders, to be a relinquishment of at least some of the constitutional rights enunciated by Troxel[16] as the trial court did, or whether we simply find that his agreement, as incorporated into two court orders, factually and, as a matter of law, established an equality of interests and rights as between

---

[15] Although McEntire was a pre-Troxel case, we find it still viable and its principles applicable under the facts and circumstances here. See, *infra* n.12.

[16] In its opinion letter, the trial court carefully circumscribed the breadth of father's "waiver," when it held that "a change from joint legal custody to sole custody" in grandfather "would be an additional restriction of [father's] constitutional right," and something to which father did not agree, unlike his "relinquishment of his protected constitutional right [which] occurred when he consented to joint legal custody." Thus, father only agreed to and, according to the trial court, waived joint legal custody and primary physical custody.

father and grandfather, analogous to the equality posited when two fit parents who are both deemed to be acting in the child's best interests dispute custody.[17]

Finally, we note that an initial custody determination was not at issue before the court. Rather, the parties requested a modification of a preexisting custody order.

> "A trial court, in determining whether a change of custody should be made, must apply a two-pronged test: (1) whether there has been a [material] change in circumstances since the most recent custody award; and (2) whether a change in custody would be in the best interests of the child. Whether a change of circumstances exists is a factual finding that will not be disturbed on appeal if the finding is supported by credible evidence."

Ohlen v. Shively, 16 Va. App. 419, 423, 430 S.E.2d 559, 561 (1993) (quoting Visikides v. Derr, 3 Va. App. 69, 70, 348 S.E.2d 40, 41 (1986)).

> After a material change of circumstances has been established, a trial judge, in determining the best interests of a child, may properly consider the factors set forth in Code § 20-107.2. Those factors are normally considered in a custody hearing and include any "other factors as are necessary to consider the best interests of the child or children." Code § 20-107.2(7). In addition, the statute further instructs that the court "shall give primary consideration to the welfare of the child or children." Id. The use of these factors clearly satisfies the requirement that "a change in custody . . . be in the best interests of the child."

Id. at 423-24, 430 S.E.2d at 561 (citations omitted).

---

[17] Father argues, *inter alia*, that any waiver he consented to was limited, citing to the agreement language which he alleges envisioned a resumption of custody in father. Even assuming we accept his characterization of the nature of the waiver, the result remains unchanged. Once custody is posited in grandfather, together with the presumption that grandfather will act in the child's best interests, grandfather remains clothed with that custodial right and attendant presumption until he himself waives it by voluntarily relinquishing custody, or alternatively, a court of law divests grandfather of that right by finding that it no longer is in the best interests of the child to remain within his custody. Indeed, that latter resolution of the issue is precisely what occurred in this case when the court determined that physical custody in the grandfather, as established by the South Carolina order, should terminate and be awarded to father.

Father agreed to be bound by the South Carolina order, which reflected the mother's desire for the grandfather to act as the child's custodian until father established a more sound relationship with the child. The agreement was prepared in contemplation of her death. Thus, her passing was not a sudden, unplanned event, which they could not have anticipated. The South Carolina family court entered a seven-page custody order after hearing testimony from the parties, reviewing the record in the case, and evaluating the agreement. The parties requested the family court to approve the agreement and incorporate it into the final order along with other related matters. In its concluding paragraph, the family court judge "ordered that the Agreement attached hereto and the terms included herein are hereby approved and adopted as the Order of this Court, to be fully enforceable by the contempt powers of this Court." The fact that a valid order was entered in South Carolina, registered and filed in Fairfax, after which father agreed to the entry of a subsequent consent order reiterating grandfather's right to joint legal custody, convinces us that the situation here is readily distinguishable from a dispute between a parent and non-parent, like the situations in Troxel and Williams. "A party must obey an existing custody order until a modification order supersedes it." Johnson v. Johnson, 26 Va. App. 135, 146, 493 S.E.2d 668, 673 (1997).

Because the matter on appeal from the circuit court was not an initial custody and visitation determination, father, as the party seeking to modify the prior custody and visitation consent order, bore the burden of proving that a material change of circumstances had occurred since the entry of the consent order and that a change in visitation would be in the best interests of the child. See Code § 20-108; Albert, 45 Va. App. at 807, 613 S.E.2d at 868 (finding that, "[u]nlike Troxel, this case involves not an initial" custody or visitation petition filed by a non-parent, but "an attempt on the part of the natural parent to terminate custody granted to a [non-parent] pursuant to a final valid consent decree").

- 21 -

We, therefore, find no error or abuse of discretion in the trial court's denial of father's motion to vest sole legal custody of the child in him at this time. The court neither applied the incorrect legal standard nor violated any constitutional right enjoyed by father in this case.

GRANDFATHER'S ARGUMENTS

Finally, we turn to grandfather's contentions on appeal. He argues that the court erred in finding that a material change of circumstances had occurred which warranted awarding physical custody of the child to father on the ground the evidence failed to support the result. We disagree and find no error.

When a court hears evidence at an *ore tenus* hearing, its decision is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it. Piatt v. Piatt, 27 Va. App. 426, 432, 499 S.E.2d 567, 570 (1998). On appeal, we view the evidence in the light most favorable to the prevailing party, granting that party the benefit of any reasonable inferences. Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003). "That principle requires us to discard the evidence of the appellant which conflicts, either directly or inferentially, with the evidence presented by the appellee at trial." Id.; see also Donnell v. Donnell, 20 Va. App. 37, 39, 455 S.E.2d 256, 257 (1995) (citing McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346 (1990)). Consistent with the principle that an appellate court does not substitute its judgment for that of the trial court, we are bound by the credibility and weight determinations made by the trier of fact and its decision to accept or reject a witness' testimony. Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986); see also Richardson v. Richardson, 242 Va. 242, 246, 409 S.E.2d 148, 152 (1991). Applying the best interests of the child standard and reviewing the evidence in the light most favorable to father, we find no error.

We, likewise, find no error in the court's decisions on certain evidentiary matters in the case. Grandfather contends, first, that the trial court improperly admitted testimony of certain witnesses on the ground that he was prevented from taking their depositions, "resulting in a trial by ambush" precluding him from "impeaching or effectively cross-examining these witnesses."[18]

Rule 4:12(a) allows "[a] party, upon reasonable notice to other parties and all persons affected thereby, [to] apply for an order compelling discovery." Rule 4:12(b)(2) provides that the court in which an action is pending may sanction a party for "failure to comply with [such an] order." The record shows that grandfather filed a motion to compel on November 7, 2003, however, the motion did not include requests for information he claims was not disclosed. In his briefs, grandfather did not direct us to where in the record he filed such a motion. Absent a motion to compel and entry of an order, the trial court was not required to apply any sanctions pursuant to Rule 4:12(b).

Moreover, the record shows that father disclosed his witnesses, but that grandfather did not timely act to depose them. Thus, even if a motion to compel had been filed and granted, we cannot say that the trial court abused its discretion in refusing to exclude the evidence.

Grandfather's contention that evidence of the father's marital stability and the counseling he and his wife received was improperly admitted at trial is likewise without merit. The basis of his contention is that the Tencers refused to answer deposition questions related to the issues they were later permitted to address at trial and that the Tencers had additionally moved to quash the depositions of certain counselors who later at trial were permitted to testify on the same matters.

---

[18] Ultimately, the court permitted grandfather to take the deposition of one of the ten witnesses after four witnesses had already testified at trial.

As with grandfather's other discovery complaint, the record fails to show he filed a motion to compel pursuant to Rule 4:12(a). Absent such a motion and attendant order, we cannot say the trial court abused its discretion.

In addition, the trial court ruled, pursuant to Code § 20-124.3:1, that grandfather could not obtain privileged and confidential information from the Tencers' mental health care providers. Grandfather contends he had a right to obtain such information to rebut testimony from the Tencers' friends and from the Tencers about the stability of their marriage. The trial court's ruling regarding the mental health professionals is not before us, so we decline to address grandfather's argument on that issue. Moreover, the record shows that grandfather received a list of witnesses and had an opportunity to timely depose or move to compel discovery of them regarding the Tencers' marital stability, but did not do so. Finally, we note that grandfather had an opportunity to cross-examine the witnesses at trial. Accordingly, we are unable to find that the trial court committed reversible error regarding discovery.

For the reasons stated, we affirm the trial court.

<u>Affirmed.</u>