## Richmond

CHARLES G. DYER, JR., ET AL. v. THOMAS COLEMAN HOWELL, ET AL.

November 29, 1971.

Record Nos. 7651, 7652 and 7653.

Present, All the Justices.

*Edward E. Lane,* for appellants in Record Nos. 7651, 7652 and 7653.

*James M. Minor, Jr. (William C. Wood; Minor, Thompson, Savage, Smithers & Benedetti,* on brief), for appellees in Record Nos. 7651, 7652 and 7653.

CARRICO, J., delivered the opinion of the court.

This controversy involves questions of the custody and adoption of Kathryn Lynn Dyer (Kathy), now seven years old. The three appeals before us bring up for review (1) the trial court's denial of a petition filed by Charles G. Dyer, Jr., natural father of Kathy, praying that her custody be changed from Thomas C. and Rebecca Lane Howell, the child's maternal aunt and uncle, to himself, (2) its denial of the petition of Carole Williams Dyer, present wife of the natural father, for adoption of Kathy, and (3) its granting of the petition of the Howells for the adoption of Kathy.

The evidence shows that Charles G. Dyer, Jr., married his first wife, Emma Lane Dyer, in March, 1964, when he was sixteen and she was fifteen years of age. On November 11, 1964, Kathryn Lynn Dyer, the infant around whom this controversy revolves, was born to this couple.

On November 30, 1965, Dyer killed his wife. On that day, upon a petition filed by a police officer alleging that Kathy was "without proper parental care and supervision," the Juvenile and Domestic Relations Court of Henrico County assumed Kathy's custody. She was placed in "the temporary custody of the Henrico County Probation Department," which in turn placed her with the Howells, where she has resided ever since.

Pursuant to an agreement with the Howells, Dyer was permitted the privilege of having Kathy visit with him. However, this privilege was later terminated on the advice of a child psychiatrist because the visits with the father were upsetting Kathy.

On January 21, 1966, the Howells petitioned the trial court for the adoption of Kathy. This proceeding was delayed in order to obtain Dyer's consent to and ascertain his feelings about such adoption. When a welfare report disclosed his opposition to the adoption, the case was continued generally.

On January 11, 1967, Dyer was tried in the Circuit Court of Henrico County for the murder of his wife and was found not guilty by reason of insanity. He was committed to a state hospital where he remained until August, 1967. On August 3, 1967, the court entered an order reciting that Dyer was not "mentally ill" but was "mentally competent" and providing that he be "forthwith discharged and released." The order further provided that Dyer report to Dr. James Asa Shield, a psychiatrist, for such examination and treatment as the doctor deemed necessary. Dyer remained under Dr. Shield's care until September, 1969.

Following his discharge and release by the Circuit Court, Dyer was summoned to Juvenile Court for a hearing concerning Kathy's custody. On November 10, 1967, that court formally awarded Kathy's custody to the Howells. An appeal was taken from this award but the appeal was later withdrawn.

On June 28, 1968, Dyer married Carole Williams, and in April, 1969, a son was born to them. In December, 1969, Dyer filed his present petition for change of Kathy's custody. He also filed an answer to the Howell petition for adoption, stating his opposition thereto. Then Carole Williams Dyer filed her petition for adoption of Kathy, attaching Dyer's consent.

In March, 1970, the three cases, *i.e.*, the Howell petition for adoption, Dyer's petition for change of custody, and Mrs. Dyer's petition for adoption, came on to be heard together. In August, 1970, the trial court announced its decision in a written opinion.

The court found that it would not be in the best interests of Kathy to alter her custody. It therefore denied Dyer's petition for a change of custody and Mrs. Dyer's petition for adoption. The court further found that "the future welfare of the infant in question will be best promoted" by granting the Howell adoption petition and that the natural father's consent thereto was being withheld contrary to the child's best interests. The court accordingly granted the Howell petition for adoption of Kathy. The rulings were incorporated in orders entered November 2, 1970.

It is from these rulings that the Dyers appeal. Their assignments of error present two questions: (1) Did the trial court err in refusing Dyer's petition for a change of Kathy's custody and in consequently refusing Mrs. Dyer's petition for adoption? (2) Did the trial court err in then granting the Howell petition for adoption?

We first decide the propriety of the refusal to change custody from the Howells to Dyer.

The parties are in disagreement over what rule of law is applicable to disposition of the custody question. Dyer contends that the usual rule applicable in custody disputes between parents, *i.e.*, that the welfare of the child is of paramount concern, is inapplicable here where he, as the surviving natural parent, is seeking a change of custody from those not occupying parental status. The rule here, Dyer says, citing *Judd* v. *Van Horn*, 195 Va. 988, 81 S.E.2d 432 (1954), is that he, as the natural parent, is entitled to custody unless it is proved that he is unfit, the law presuming that the best interests

of the child will be served by placing her in his custody. The burden was upon the Howells, Dyer argues, to prove his unfitness; they failed to carry that burden and he should have been awarded immediate custody of Kathy.

The Howells, on the other hand, contend, citing *Forbes* v. *Haney*, 204 Va. 712, 133 S.E.2d 533 (1963), that the proper rule is that the welfare of the child is the paramount consideration and that where such welfare would best be served by denying custody to the parent, the technical rights of the latter may be disregarded. The Howells argue that it was shown, and the trial court found, that Kathy's best interests would be served by permitting her to remain in their custody. This being so, the Howells say, it was proper to deny Dyer's petition for change of custody.

■ We need not stop to resolve what appears to be a conflict between the rule set forth in *Judd* v. *Van Horn, supra,* and that set forth in *Forbes* v. *Haney, supra.*[1] There is a legal factor in this case which makes the *Judd* rule inapplicable in any event and requires that our decision be controlled by the *Forbes* rule. That factor is that the order of the Juvenile Court of November 10, 1967, formally divested Dyer of custody of Kathy and awarded her custody to the Howells. For Dyer to be entitled to a later change of custody, the burden was upon him to show that circumstances had so changed that it would be in Kathy's best interests to transfer her custody to him. Thus, the rule of decision in this case is that the welfare of the child is the paramount consideration.

At trial, Dyer did show that his circumstances had changed from the time the Juvenile Court divested him of Kathy's custody. He had attended college for one year and had secured gainful employment. He had remarried and become the father of a second child. His wife was also gainfully employed. He had purchased an old home in New Kent County, was restoring it, and was planning to move his family there. He had been discharged by his psychiatrist, who considered him "competent to be a father." And during the time his privilege of visiting with Kathy was in effect, a strong bond of affection had developed between them.

That was the bright side of Dyer's picture, as shown by the evidence. On the other side, it was shown that Kathy's visits with Dyer produced "a great deal of anxiety and tension" in the child, a condi-

---

[1] Both *Judd* v. *Van Horn* and *Forbes* v. *Haney* involved custody disputes between parent and non-parent.

tion which improved after the visits were terminated. It was also shown that Dyer had contributed nothing to the support of Kathy after he had become gainfully employed. And although Mr. and Mrs. Dyer were described as "a charming couple," it was stated that their marriage had "not been tested."

It was Dyer's plan, if awarded the custody of Kathy, to enroll her in private school in New Kent County. However, he had made no provision for the $500 annual tuition required for that purpose. In fact, in the contemplated move to New Kent, Mrs. Dyer planned to quit work, thus reducing the family's income to a level insufficient to meet living expenses, even without Kathy's presence in the household.

Further, there was testimony from a psychiatric expert called as a witness by Dyer that the latter was involved in "an undifferentiated family ego mass" with his parents. This was described as a situation "where there is a kind of sticky emotional thing working within a family where" the members "are so tied in with each other emotionally that no one can operate individually without having some fear or trepidation about getting the rest of the system upset." Although the witness stated that Dyer was "attempting to make a greater differentiation of self," he also said that Dyer's emotional involvement with his family was "basically the type of circumstance that . . . occurred in the Dyer home at the time that Mr. Dyer killed his first wife."

In contrast, Kathy's situation in the Howell home presented quite a different picture. Kathy went to live with the Howells when she was one year old. At time of trial, she had been in their home almost 4½ years. It was described as "the only home she has ever known." She looked upon Mr. and Mrs. Howell as her father and mother and upon their daughter, Rachel, two years old, as her sister. In turn, Mr. and Mrs. Howell regarded Kathy as their own daughter.

The Howells had been married approximately 6 years at time of trial, and their marriage was described as "settled." They were depicted as "a very stable and ambitious young couple" with income sufficient to provide for support of their family, including Kathy, and a comfortable home adequate for their needs.

A child psychiatrist called as a witness by the Howells testified that Kathy was "emotionally the child of" the Howells "to whom she has deep and important and the essential mother-father ties." The witness stated that Kathy had become "quite stable" under the

care of the Howells. When asked what would be the effect upon Kathy of removing her from the Howell home, the witness replied, "It would be catastrophic."

In settling this custody dispute, the trial court was vested with wide discretion. This was necessarily so because the determination of what was in Kathy's best interests was basically a factual matter, in the resolution of which the opportunity of the trial judge to see the witnesses and hear them testify was, as shown by his written opinion, of crucial importance.

The judgment of the trial court denying Dyer's petition for a change of custody is presumed to be correct, and we cannot disturb it unless plainly wrong or without evidence to support it. And the burden is upon Dyer to show that it is wrong.

With these principles in mind, we hold that the trial court did not err in ruling that the best interests of Kathy would not be served by transferring her custody to Dyer. In so holding, we have not overlooked the expressed and obviously sincere desire of the father to have the child with him or his claimed right as the natural parent, which in different circumstances we would respect, to be awarded her custody. But we cannot regard the proposed transfer of custody to him as other than a problematical experiment, in the failure of which the welfare of the child might well be seriously jeopardized.

We conclude, therefore, that the trial court properly denied Dyer's petition for change of custody. It follows that the consequent denial of Mrs. Dyer's petition for adoption was also proper.

This brings us to the question whether the trial court erred in allowing the adoption of Kathy by the Howells.

The record shows that the Howells had met all the technical requirements of Code § 63.1-220 *et seq.*, relating to adoption, except the requirement of Code § 63.1-225 that parental consent be obtained. Dyer contends that the adoption by the Howells should not have been granted without his consent.

Code § 63.1-225 further provides, however, that if the court finds that the consent of the parent "is withheld contrary to the best interests of the child . . . the court may grant the petition without such consent." Thus the question becomes whether the trial court properly ruled that Dyer's consent to the adoption of Kathy by the Howells was withheld contrary to her best interests.

In addition to the evidence previously outlined on the custody question, the trial court had before it two reports of welfare authori-

ties recommending the adoption of Kathy by the Howells. From these reports and the other evidence before the court, it is clear that the one thing for which the welfare of Kathy cries out is permanent stability in proper surroundings. It is problematical that she could get that stability in Dyer's home. She can get it in the Howell home.

To deny the adoption by the Howells now, against the possibility that Dyer might at some unknown time in the future be able to prove himself entitled to a change of custody, would be to deny Kathy, contrary to her best interests, the security and stability she so desperately needs. So the trial court was warranted in holding that Dyer's consent to the Howells' adoption of Kathy was being withheld contrary to her best interests and in granting the adoption without such consent.

The judgment in each of the three cases will be affirmed.

*Affirmed.*