COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Athey and Bernhard
Argued by videoconference


DONALD SHIFFLETT

MEMORANDUM OPINION* BY
v.     Record No. 0156-24-3     JUDGE CLIFFORD L. ATHEY, JR.
FEBRUARY 10, 2026

NATALIE LYNCH


FROM THE CIRCUIT COURT OF HENRY COUNTY
G. Carter Greer, Judge

Dirk B. Padgett for appellant.

Ward L. Armstrong (Stacy D. Allocca, Guardian ad litem for the
minor child; The Armstrong Law Firm of Va., PLLC; Stacy D.
Allocca, PC, on brief), for appellee.


Donald Shifflett ("grandfather") appeals an order from the Circuit Court of Henry County

("circuit court") awarding Natalie Lynch ("mother") custody of mother's child—grandfather's

paternal granddaughter—D.R.S.[1] Grandfather assigns error to the circuit court for "granting

[mother] custody of [D.R.S.] under the best interest of the child standard when the only material

change of circumstances involved the lifestyle change of [mother]." Finding no error, we affirm.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] We use the child's initials to protect her privacy.

Mother and Matthew Shifflett are D.R.S.'s biological parents. Although they both reside in Maryland, they live separate and apart from each other. They also share two other children, one of whom is older than D.R.S. while the other child is younger.[3] Grandfather is D.R.S.'s paternal grandfather.

In 2014, mother was incarcerated after being previously convicted of several felony drug offenses. Mother gave birth to D.R.S. while she was incarcerated. As a result of mother's incarceration, D.R.S. initially lived with grandfather and his wife in Henry County. When mother was released from incarceration in 2016, mother initially lived with her parents in their home. When grandfather's wife passed away later in 2016, D.R.S. moved in with her mother and maternal grandparents in their home. However, after two months, D.R.S. returned to grandfather's home because mother had been attending drug treatment court and "was struggling." In 2017, grandfather was granted physical and legal custody of D.R.S., in part, to permit him to obtain necessary medical services for the toddler. By August of 2017, mother began residing in a sober halfway house.

After grandfather was granted physical and legal custody of D.R.S., mother was permitted to visit with D.R.S. monthly under grandfather's supervision. The supervised visitation evolved to eventually permit D.R.S. to visit with mother on weekends at local hotels in Henry County. Mother was able to maintain her sobriety and completed multiple substance abuse treatment programs during this time. By 2019, mother obtained employment as both a certified peer recovery specialist

---

[2] On appeal, we view "the evidence in the light most favorable" to mother because she prevailed below; we give her "the benefit of any reasonable inferences." *Veldhuis v. Abboushi*, 77 Va. App. 599, 602 n.2 (2023) (quoting *Young Kee Kim v. Douval Corp.*, 259 Va. 752, 756 (2000)). Further, the record in this case is sealed. We unseal only those facts discussed in this opinion; the rest of the record remains sealed. *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

[3] The custody of D.R.S.'s siblings is not an issue to be considered in this appeal.

for the State of Maryland and as a part-time machine operator. Mother also purchased a townhome in Maryland in 2019, where she resided with her youngest child. Most of mother's family, including D.R.S.'s older sister, "lived near mother." In addition, D.R.S.'s father lived "within 25 minutes from [mother]," and mother had developed a cordial relationship with him.

In 2020, grandfather petitioned the circuit court to adopt D.R.S.; however, his adoption petition was denied. In 2021, mother petitioned the Juvenile and Domestic Relations District Court for Henry County ("JDR court") seeking custody or increased visitation with D.R.S. Mother's petition asserted that she had become financially stable, gained employment, and owned her own home. Moreover, mother claimed that these improvements she had achieved in her life constituted a material change in circumstances warranting a change in the custody of D.R.S. The JDR court subsequently appointed a guardian ad litem ("GAL") to represent D.R.S. for the duration of the custody proceedings.

On November 18, 2021, the JDR court ordered the completion of a home study to better inform the JDR court concerning any future custody determination. The home study generally included several interviews with mother and her children that were conducted in 2022 as well as further data regarding mother's lifestyle up to 2023. The home study also specifically required a review of mother's financial statements and medical records, including recent drug tests. The home study also considered several character recommendations from mother's friends and community members.

In the resulting home study report, the social worker conducting the study found mother to be knowledgeable about the child's needs and financially stable. The report also concluded that mother's townhome was an appropriate placement for D.R.S. The social worker further emphasized that mother was negative for drugs in her most recent drug test and had obtained an associate's degree in January 2023. The social worker further noted that mother "has the support of

her family and friends, and appropriate resources to raise an additional child in her home," observing that mother "has changed her life around."

The JDR court held a hearing on mother's petition in July of 2023.[4] Although the JDR court denied mother's petition for custody, the court granted mother more liberal visitation with D.R.S., permitting mother additional visitation with D.R.S. every other week. Mother appealed to the circuit court for a trial de novo. The trial before the circuit court was subsequently set to commence on January 4, 2024.

During the de novo hearing in the circuit court, mother acknowledged that grandfather had "stepped up" by providing for the child, that D.R.S. and grandfather shared a bond, and that mother planned to preserve D.R.S.'s relationship with grandfather by encouraging visits and phone calls between them. However, mother testified that D.R.S. exhibited negative emotions when being returned to grandfather's home following visitation. For example, mother testified that when she would take D.R.S. back to grandfather's house in Virginia, "there was a change in [D.R.S.'s] demeanor"; she became "argumentative," let "her body . . . droop," and sometimes "pretend[ed] that they were not at [grandfather's] home." Mother also expressed concerns about the cleanliness of grandfather's home and the child's hygiene while living there. Mother further recounted that grandfather sometimes undermined the parents' relationship with the child. For example, she explained that grandfather had shortened some of mother's visits with the child, yelled at mother about the custody litigation in front of the child, allowed the child to call grandfather "dad," and told D.R.S.'s father that he should "go kill himself."

Mother also testified that during the summer of 2023, she visited D.R.S. every other week. Mother further explained that, by having increased visitation, D.R.S. developed positive

---

[4] There is no transcript of this hearing in the record.

relationships with her younger half-brother and extended family.[5]  Mother also testified that D.R.S. made friends over that summer in mother's neighborhood in Maryland.  Mother further testified that she had received a promotion at work with a significant salary increase in 2023.  Finally, Mother introduced the home study into evidence.

After mother rested her case-in-chief, grandfather moved to strike, but the circuit court denied the motion.  Grandfather then testified that until 2020, mother visited the child only a few times a year and then her visits increased to only every five to six weeks.  He also explained that the custody dispute had strained his relationship with his son, which was why he harbored some hostility toward D.R.S.'s father.  Grandfather also acknowledged that he had been previously convicted of distribution of cocaine.  He also testified that in 2002, he was convicted of negligent manslaughter as a result of killing two people in a vehicular accident while driving intoxicated.  Grandfather further admitted that he had not been licensed to drive a motor vehicle in Virginia for 22 years but still continued to illegally drive with D.R.S. in the vehicle.  Grandfather also admitted that he had been involved in an automobile accident "recently" but D.R.S. was not in the vehicle during the accident.  Grandfather also testified that he was a healthy 68-year-old man whose home was "lived in" and that he had provided food, clothes, and toys to the child for most of her life.  He also testified that the night before the hearing, he allowed D.R.S., who was nine at the time, to sleep in bed with him.  He shared that D.R.S. excelled academically, went to church regularly, and had several friends in Virginia.

Grandfather called several other witnesses to testify about D.R.S.'s behavior.  A teacher at D.R.S.'s elementary school in Virginia testified that D.R.S. was "well-behaved" and "work[ed] to get other kids to get along."  The principal at that school then testified that D.R.S. was "an honor roll student" who was "pleasant with no behavior issues."  A neighbor's daughter further described

---

[5] D.R.S. and her half-brother share mother as their biological mother.

the child as very happy. Lastly, the pastor at grandfather's church testified that grandfather and D.R.S. attended church "regularly" but noted that D.R.S. "t[ook] a little while to warm up" and "ha[d] become a little withdrawn from it."

During her closing statement, mother contended that she "ha[d] overcome her obstacles in her life, . . . followed the prior order for visitation[,] and ha[d] a right to be given the chance to be [D.R.S.'s] mother." She also claimed that "[s]he ha[d] been drug free for years, ha[d] been able to purchase her own home, . . . [and] [wa]s a productive member of society." She further acknowledged that "[she] could no longer avail herself of the parental presumption" because of "the previous relinquishment/divestiture of . . . mother's custody of [D.R.S.]," but she nevertheless concluded that "it was in [D.R.S.'s] best interests for legal and residential custody to be given to [her]."

Grandfather, in response, asserted that "a significant amount of evidence was provided about the mother[,] and the focus has been on the mother but not what was in the best interest of the child." Grandfather also contended that there was "no presumption that the child should be with . . . mother," who had never had custody or any extended period of visitation with the child. Grandfather maintained that mother had failed to prove that a change in custody was in the best interest of the child, having only demonstrated that she was now a "better person," which was "insufficient as a matter of law to give her custody of [D.R.S.]."

The GAL then presented her report, which described D.R.S. as extremely shy, studious, and on the cusp of adolescence. The GAL also reported that she "had never had a child that was so guarded and reserved" but that the child was more relaxed and open with mother than with grandfather. The GAL explained that mother's home provided D.R.S. with more opportunities to interact with family and friends. The GAL then noted that D.R.S. had smiled at the thought of living with mother. The GAL also thought grandfather was emotionally dependent on the child and

associated D.R.S. with his deceased wife.  The GAL then opined that it was in the child's best interest to grant mother custody and ultimately recommended that outcome.

Following the closing statements, the circuit court granted sole legal and physical custody to mother and granted grandfather visitation.[6]  In support of its decision, the circuit court, having read the home study, "was impressed that [mother] had done so well as it is rare to see a person convicted of a felony, spending time in prison and with a substance abuse disorder[,] to then turn their life around."  It found mother's transformation to be a material change in circumstances since the initial custody award in 2017.  The circuit court then considered the statutory factors for determining the best interest of the child, as provided in Code § 20-124.3.  Based upon the factors, the circuit court further found that both parties were healthy, stable, and close with the child.  In addition, the court found that the child had friends at both houses, although the child had more extended family near her mother in Maryland.  The circuit court also acknowledged that grandfather had come through for the child and done a great job as the custodian.  But the circuit court also noted, "The Grandfather's goal should ultimately be the reunification of his Granddaughter with her parents.  No matter how much he tries to be, he will never be her father.  While he has done a beautiful job rearing the [c]hild, he will never be able to substitute for the [c]hild's Mother."  The circuit court also found the GAL's report persuasive.

As a result of considering all the factors, the circuit court concluded that mother was in a better position to parent the child moving forward.  In further support of its decision, the circuit court noted that the child would soon undergo "developmental changes," which grandfather could have been less suited to handle.  The court also cited the testimony concerning grandfather sometimes impeding mother's visitation and his poor relationship with his son.  The circuit court also expressed concern that grandfather angrily talked about the custody proceedings in front of the

---

[6] The circuit court also ordered visitation for father.

child; allowed the child to co-sleep with him; drove illegally with the child, which the court said set a "bad example"; and allowed the child to call him "dad." In addition, the circuit court referenced grandfather's age as potentially making it difficult to parent the child in the future. Finally, the circuit court found that the shy girl opened up under mother's care and was receptive to moving in with mother, who had more extended family in the area of Maryland where she would be residing.

The circuit court entered its final order on January 17, 2024. Grandfather appealed.

## II. ANALYSIS

### A. *Standard of Review*

"We review the trial court's decisions on custody and visitation for an abuse of discretion." *Rainey v. Rainey*, 74 Va. App. 359, 376 (2022). An "'abuse of discretion' means that the circuit court 'has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Sauder v. Ferguson*, 289 Va. 449, 459 (2015) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). "Thus, '[o]nly when reasonable jurists could not differ can we say an abuse of discretion has occurred.'" *Id.* (alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

### B. *The circuit court did not err by awarding mother custody.*

Grandfather first claims there was no "nexus" between mother's changed circumstances and D.R.S.'s best interests, ultimately asserting that the evidence was insufficient to support a best-interest finding in mother's favor. He also asserts that the circuit court improperly applied a parental presumption to mother. We disagree.

In deciding whether to order a change in custody, the circuit court "must apply a two-pronged test." *Denise v. Tencer*, 46 Va. App. 372, 395 (2005) (quoting *Ohlen v. Shively*, 16 Va. App. 419, 423 (1993)). "First, the trial court must decide 'whether there has been a [material]

change in circumstances since the most recent custody award.' If so, the trial court must next determine 'whether a change in custody would be in the best interests of the child.'" *Surles v. Mayer*, 48 Va. App. 146, 171 (2006) (alteration in original) (quoting *Ohlen*, 16 Va. App. at 423). So "even if there has been a change in circumstances, 'there can be no change in custody unless such change will be in the best interests of the children.'" *Visikides v. Derr*, 3 Va. App. 69, 71 (1986) (quoting *Keel v. Keel*, 225 Va. 606, 612 (1983)). Each prong is addressed in turn.

1. Mother satisfied her burden of proof to show a material change in circumstances.

First, mother needed to show that "there has been a [material] change in circumstances since the most recent custody award." *Surles*, 48 Va. App. at 171 (alteration in original) (quoting *Ohlen*, 16 Va. App. at 423). "Whether a change in circumstances exists is a factual finding that will not be disturbed on appeal if the finding is supported by credible evidence." *Denise*, 46 Va. App. at 395 (quoting *Ohlen*, 16 Va. App. at 423).

Here, the evidence adduced during the hearing supported a finding that there was a material change in circumstances. In support, mother's instability and inability to provide for the child in 2017 had materially changed by 2024, with mother having been sober for approximately ten years. The evidence also reflected that by the time of the trial in the circuit court, mother was financially secure and had suitable housing. Mother's new home also provided the child with more opportunities to interact with family and friends. The record supports the circuit court's conclusion that mother had steadily increased visitation with the child, resulting in successful bi-weekly visits and a close relationship. In addition, the home study report, which was based on a review of financial statements, medical records, and several interviews about mother's transformation, also concluded that mother's townhome was appropriate for the child's placement. The evidence also showed that, since he gained custody of D.R.S. in 2017, grandfather had at times undermined mother's relationship with D.R.S., sometimes shortening

her visits. Thus, the circuit court did not err in determining that there was a material change in circumstances since the first custody award in 2017 because there is "credible evidence" to support its finding. *See Denise*, 46 Va. App. at 395.

Grandfather assigns error to the circuit court finding a material change in circumstances based upon his contention that mother simply provided evidence that she was a "better person," which he claims is "insufficient as a matter of law to give her custody of [D.R.S.]." However, our Supreme Court has rejected such a narrow view when finding a material change in circumstances. True, "[t]he 'change in circumstances' referred to in the first prong of the test" includes "negative events [that] have arisen at the home of the custodial parent." *Keel*, 225 Va. at 611-12. But the changed-circumstances prong "is also broad enough *to include positive changes in the circumstances of the noncustodial parent*," including "remarriage and the creation of a stable home environment, increased ability to provide emotional and financial support for the children, and other such changes." *Id.* at 612 (emphasis added). This becomes more acute when these changes are coupled with unsanctioned limitations on visitation. *See Garrett v. Hanna*, No. 1276-23-3, slip op. at 9 (Va. Ct. App. Sept. 24, 2024) (per curiam) (affirming a circuit court's finding of a material change in circumstances when the noncustodial parent became engaged and received "pushback" from the custodial parent on visitation).[7]

Here, as the evidence at the hearing demonstrated, mother "turn[ed] [her] life around"—obtaining stable housing, regular employment, financial independence, and widespread familial support—and grandfather limited mother's visitation on some occasions. This is precisely the kind of evidence we have endorsed for establishing a material change in circumstance. *See Keel*, 225 Va. at 611-12; *cf.* Code § 20-108 ("The intentional withholding of visitation of a child from the other

---

[7] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023) (quoting *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012); *see* Rule 5A:1(f).

parent without just cause may constitute a material change of circumstances justifying a change of custody in the discretion of the court."). So grandfather's argument is unconvincing.

Grandfather further claims that evidence of only mother's transformation is insufficient as a matter of law *without the parental presumption* to establish a material change in circumstances. But this contention confuses the role of the parental presumption in the legal framework.

The parental presumption establishes that, "in a custody dispute between a parent and a non-parent, 'the law presumes that the child's best interests will be served when in the custody of its parent.'" *Bailes v. Sours*, 231 Va. 96, 100 (1986) (quoting *Judd v. Van Horn*, 195 Va. 988, 996 (1954)). But when a parent's custody is vitiated, either by "a previous order of divestiture" or "voluntary relinquishment," then "the natural parent who seeks to regain custody must bear the burden of proving" both prongs of the change-in-custody standard. *Florio v. Clark*, 277 Va. 566, 571 (2009); *see Dyer v. Howell*, 212 Va. 453, 456 (1971) (holding that when a court previously removed custody from a parent, "the burden was upon [the parent] to show that circumstances had so changed that it would be in [the child's] best interests to transfer her custody to him").

Critically, whether mother satisfied her burden to show a material change in circumstances is a separate analytical issue from who bears that burden in the first place. So determining whether there is a material change in circumstances warranting a change in custody does not necessarily implicate the parental presumption. Indeed, Virginia caselaw consistently endorses a parent's ability to satisfy their burden of proof for a change in custody even though that parent does not receive the benefit of the parental presumption. *See Florio*, 277 Va. at 571 (explaining that a parent, without the benefit of the parental presumption, can still establish a change in custody if they meet their "burden of proving that custody with [the parent] is in the child's best interests"); *Shortridge v. Deel*, 224 Va. 589, 594 (1983) (same); *Dyer*, 212 Va. at 456 (same); *Szemler v. Clements*, 214 Va. 639, 644 (1974) (same); *Fleshood v. Fleshood*, 144 Va. 767, 769-70 (1925) (same).

As a result, here, mother bore the presumption "to show that circumstances had so changed that it would be in [the child's] best interests to transfer . . . custody to [her]." *Dyer*, 212 Va. at 456. And she could have utilized *any* of the permissible means in establishing a material change in circumstances in order to satisfy her burden of proof even though she did not retain the benefits of the parental presumption. *See Keel*, 225 Va. at 611-12 (listing the ways a material change in circumstances may be proven); *see also Dyer*, 212 Va. at 456 (describing how a parent may still be able to change custody even though they do not receive the benefits of the parental presumption). She did so in this case. Accordingly, the circuit court did not err in concluding that such changes in mother's circumstances were material.

2. Mother satisfied her burden to show that a change in custody was in the best interests of the child.

After establishing a material change in circumstances, mother then needed to show that "a change in custody would be in the best interests of the child." *Surles*, 48 Va. App. at 171 (quoting *Ohlen*, 16 Va. App. at 423). For this prong, "[t]he circuit court has 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Wynnycky v. Kozel*, 71 Va. App. 177, 193 (2019) (quoting *Eaton v. Dep't of Soc. Servs.*, 66 Va. App. 317, 324 (2016)). And the circuit court makes this determination by considering several factors that are enumerated in Code § 20-124.3. *Armstrong v. Armstrong*, 71 Va. App. 97, 104 (2019). Those factors include: the age of the custodian and child; the relationship between the custodian and the child, including the ability to assess the child's needs; the role each custodian has and will play in the child's care; the propensity of each custodian to support the child's relationships with others; and the child's reasonable preference. Code § 20-124.3.

Here, the circuit court also did not err by holding that altering the custody of D.R.S. was in her best interests. Evidence in the record showed that D.R.S. would have a larger network of family and friends in Maryland as compared to Virginia. Further, the circuit court credited the

GAL's testimony that the shy child was more relaxed, open, and social with mother. And evidence illustrated how D.R.S. became sullen when leaving mother's home and smiled at the thought of living with her. The circuit court utilized its "broad discretion" to find this evidence persuasive in determining awarding mother custody was in D.R.S.'s best interests. *Wynnycky*, 71 Va. App. at 193 (quoting *Eaton*, 66 Va. App. at 324).

By contrast, the evidence supported the circuit court's concerns about grandfather's ability to meet the child's needs. Grandfather jeopardized the child's safety and set a "bad example" by driving without a license. He struggled with angry outbursts, including instances when he yelled about going to court in the child's presence and told D.R.S.'s father to "go kill himself." In addition, the evidence showed that grandfather interfered with the child's relationship with her parents when he impeded mother's visitation, kept the child from D.R.S.'s father, and allowed the child to call him "dad." The GAL also expressed concerns about grandfather's emotional dependence on the child. And from this, the circuit court could reasonably infer that grandfather was less prepared for D.R.S.'s growth and independence that accompany adolescence than mother, especially when considered in tandem with grandfather's age, grandfather's co-sleeping with D.R.S., and D.R.S.'s poor hygiene when staying with grandfather. *See Wynnycky*, 71 Va. App. at 203 ("[F]actfinders may draw inferences from the evidence so long as those inferences do not 'defy logic and common sense.'" (quoting *Fox Rest Assocs., L.P. v. Little*, 282 Va. 277, 283 (2011))).

Given the circuit court's thorough review of the statutory factors, we find no reversible error in the circuit court's ruling. Instead, grandfather resists this conclusion and ultimately invites this Court to reweigh the statutory factors in his favor. "On appeal, we do not reweigh the factors to see if we would have reached a different conclusion." *Wynnycky*, 71 Va. App. at 201. It was the circuit court's responsibility to weigh the best-interest factors in light of the evidence, but a circuit court is not required "to quantify or elaborate exactly what weight or consideration it has given to

each." *Id.* (quoting *Brown v. Brown*, 30 Va. App. 532, 538 (1999)). "Because evidence supported the circuit court's factual findings that underlie the circuit court's weighing of the factors and there is nothing inherently unreasonable in its weighing of those factors, 'its ruling must be affirmed on appeal.'" *Id.* (quoting *Brown*, 30 Va. App. at 538).[8]

### III. CONCLUSION

For these reasons, the circuit court's judgment is affirmed.

*Affirmed.*

---

[8] Grandfather's final contention is that the circuit court implicitly applied the parental presumption in mother's favor when its order stated that "[t]he Grandfather's goal should ultimately be the reunification of his Granddaughter with her parents." But this contention is unavailing. This argument seemingly relies on a pair of sentences made by the circuit court when giving its entire ruling. "It is axiomatic that an appellate court must avoid 'fix[ing] upon isolated statements of the trial judge taken out of the full context in which they were made[] and us[ing] them as a predicate for holding the law has been misapplied.'" *Cellucci v. Commonwealth*, 77 Va. App. 36, 51 (2023) (en banc) (alterations in original) (quoting *Coward v. Wellmont Health Sys.*, 295 Va. 351, 363 n.11 (2018)). And after reading the circuit court's order as a whole, we disagree with grandfather's assertion because, for the majority of the circuit court's order, the court was citing, discussing, and evaluating the factors it needed to address for determining whether a change in custody was in the child's best interest. Without more, we must disagree with grandfather's contention. *See Lisann v. Lisann*, 304 Va. 242, 260 (2025) ("Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." (quoting *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977))).