PRESENT: Powell, C.J., Kelsey, McCullough, Russell, and Mann JJ., and Millette and Mims, S.JJ.

LINDSEY NICOLE PERKINS

v. Record No. 240960

OPINION BY
JUSTICE WESLEY G. RUSSELL, JR.
MARCH 12, 2026

REBECCA LYNN (HICKS) HOWINGTON,
ET AL.

FROM THE COURT OF APPEALS OF VIRGINIA

Lindsey Nicole Perkins ("mother"), the biological mother of J.H., appeals a decision of

the Court of Appeals affirming a circuit court order granting a petition filed by Rebecca Lynn

(Hicks) Howington ("stepmother") seeking to adopt J.H. without mother's consent. The lower

courts found that mother's consent was not required pursuant to Code § 63.2-1202(H). For the

reasons that follow, we affirm the judgment of the Court of Appeals.

I. BACKGROUND

J.H. was born on December 15, 2014, to mother and Justin Lee Howington ("father"). In

2018, mother and father separated but continued to share custody of J.H. Then, in 2019, father

petitioned the Tazewell County Juvenile and Domestic Relations District Court ("JDR court")

for custody of J.H. Ultimately, mother and father agreed that mother would take primary

physical custody of J.H. with both parents sharing joint legal custody over the child.

On March 3, 2020, the JDR court entered a preliminary child protective order against

mother after allegations were made that mother used drugs in the presence of J.H. Among other

things, the order prohibited mother from having unsupervised contact with J.H., required her to

submit to random drug screens, and ordered her to take all medications as prescribed. Mother

objected to the order, and the JDR court scheduled a hearing on the matter.

On May 4, 2020, the JDR court found that J.H. had been abused or neglected in mother's care based on evidence of mother's substance use disorder, including failed drug screens, admitted intravenous drug use, and observable track marks. The JDR court reissued the preliminary child protective order against mother and required mother to continue to submit to drug screens and pill counts.

On June 15, 2020, the JDR court awarded father legal and physical custody of J.H. and ordered that mother receive one-hour, weekly, supervised visitation. One month later, the JDR court found that mother had failed to comply with the court-ordered drug screens. Accordingly, on July 14, 2020, the JDR court modified its June order and issued a new child protective order revoking mother's visitation with J.H. and requiring mother to enroll with Clinch Valley Community Action ("Clinch Valley") for random drug screens, among other things. The order specifically provided that "MOTHER SHALL HAVE NO CONTACT/VISITATION WITH [J.H.] UNTIL FURTHER ORDER OF A COURT OF COMPETENT JURISDICTION."

The July 14 order was scheduled for review on August 18, 2020. At that time, the JDR court found that no motions for review, modification, or dissolution of the order had been filed, so it left the order in place.

On October 5, 2020, mother filed a motion to amend or review the July 14 order, requesting that the JDR court permit her visitation with J.H. A hearing was set for January 5, 2021, at which time the Tazewell County Department of Social Services ("DSS") moved for a bill of particulars. Mother was ordered to provide the bill of particulars on or before February 19, 2021, and the case was continued to March 18, 2021. Mother never filed the bill of particulars.

On March 18, 2021, the JDR court heard arguments on mother's motion to amend the July 14 order. The JDR court denied a motion by the DSS to dismiss mother's motion to amend, but it ordered mother to submit to additional drug screens and to allow the DSS to communicate with her probation officer and access her substance use disorder treatment records. The JDR court then continued the case to April 15, 2021, for the sole purpose of reviewing mother's request for visitation. The case was later continued once more to April 27, 2021.

On April 13, 2021, stepmother and father filed a petition in the Tazewell County Circuit Court for stepmother to adopt J.H. with father's consent.[1] They sought the adoption without the consent of mother, pursuant to Code § 63.2-1202(H), which provides that "[n]o consent shall be required of a birth parent who, without just cause, has neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption[.]" Alternatively, stepmother and father argued that, even if mother's consent otherwise was required, the adoption should still be granted pursuant to Code § 63.2-1203 because mother was withholding her consent contrary to the best interests of J.H. In particular, stepmother and father pointed to mother's history of drug use, and they alleged mother had continuously failed to comply with court-ordered drug screens.

Stepmother and father attached two letters to their petition for adoption, both of which Clinch Valley had sent to the JDR court concerning mother's drug screens. The first letter, sent in August 2020, explained that mother had completed only two drug screens despite many attempts to have her come in and be screened. Both screens were positive for Suboxone, and there were questions as to whether mother had a prescription for Suboxone at the time. Further, mother had failed to appear for an appointment on August 14, 2020, claiming afterward that she

---

[1] Father and stepmother were married on February 14, 2020.

had tested positive for COVID. In the second letter, Clinch Valley reiterated the facts from the August letter, recounted additional positive drug screens, and noted that it had been unable to reach mother between October 2020 and January 29, 2021. It did confirm, however, that mother appeared for her drug screens in January, February, and March 2021 and tested negative at all three screens.

Mother objected to the petition for adoption, arguing that the petition was premature since she had filed a motion to amend the child protective order prior to the completion of the six-month period prescribed by Code § 63.2-1202(H). Moreover, mother alleged that stepmother was manipulating the situation to gain custody of J.H. and it would not be in the best interests of J.H. to be adopted by a stepparent who was significantly involved in attempts to sever the relationship between the biological mother and child.

While the adoption petition was pending in circuit court, the JDR court held the previously scheduled April 27, 2021 hearing regarding mother's requests for visitation with J.H. At that hearing, the JDR court issued a new child protective order allowing mother supervised visitation with J.H. every other week. The new order also required mother to submit to random drug screens and pill counts, refrain from using illegal drugs, take all medications as prescribed, and cooperate with the DSS.

Over the span of approximately thirteen months, the respective matters continued in both the JDR and circuit courts. A guardian ad litem ("GAL") was appointed for J.H. and various other filings were made and proceedings, including continuances, occurred in the circuit court. During this time, the JDR court continued to hold hearings concerning the child protective orders, amendments, and mother's visitation with J.H. Mother's last visitation took place on

March 13, 2022, and, on March 30, 2022, after mother failed to appear at a hearing, the JDR court reinstated the child protective order forbidding mother from all contact with J.H.

On June 1, 2023, the circuit court took evidence *ore tenus* and heard arguments regarding stepmother and father's petition for adoption. Stepmother testified that J.H. had lived with the couple since March 3, 2020. She confirmed that mother's last contact with J.H. had been on March 13, 2022.[2] Additionally, stepmother claimed mother never requested to see J.H. during the time she was prohibited from doing so by the July 14, 2020 child protective order, and further, mother's last contact with J.H. before the order was on July 3, 2020. Stepmother admitted, however, that she would not have allowed visitation while the court order was in place even if mother had requested it.

Stepmother also stated that she and J.H. maintain a good mother-daughter relationship, that J.H. does well in school, and that J.H. is well behaved. In contrast, stepmother said J.H. began going to counseling after starting supervised visits with mother and was able to stop counseling shortly after visitations with mother ended. According to stepmother, J.H. was often nervous about the visits, cried when going to or coming from them, and sometimes refused to stay at them.

Mother testified at the hearing. At the outset of her testimony, she confirmed she was presently incarcerated for a drug distribution offense. She acknowledged that she had had a longstanding drug problem for which she had been treated and had received Buprenorphine prescriptions. She said her treatment began when she was in drug court, which was where she

---

[2] Mother objected to this statement, noting that March 13, 2022 was not before the adoption petition was filed. The circuit court overruled the objection, asserting, "[a]s far as the overall evidence as to what's in the best interest of the child she can, factually, testify as to what's happened regarding the child since then[.]"

5

met father, and she had graduated from drug court after two years. Mother claimed she did not fail any drug screens during the period from July 3, 2020 until April 2021. Rather, she claimed she had a valid prescription on the dates she tested positive for those substances.

Mother also explained that, after she filed her motion to amend the child protective order in October 2020, the case was continued several times for reasons beyond her control. She said it was first continued when she was quarantined with COVID, and it was continued again when her counsel was in the General Assembly from January through March 2021. When the JDR court finally heard the motion in April 2021, it granted mother supervised visitation. Mother subsequently exercised visitation as allowed by the JDR court until the new no contact order was entered in March 2022.

At the close of stepmother and father's evidence, mother moved to strike, arguing that she had "just cause" for her lack of contact with J.H. in the six months prior to the petition for adoption. The circuit court overruled the motion to strike. It found, as a factual matter, that mother had not contacted J.H. for a period longer than six months immediately prior to the filing of the petition for adoption. Moreover, "to say that it was not for good cause would say that, somehow, it wasn't because of the actions of the biological mother, the defendant, and the only reason she wasn't having contact with the child was because of her actions solely. . . . [T]hat's why they issued a protective order, abuse and neglect, and so the entirety of why she was not having contact with the child was on her and that's been adjudicated[.]" The circuit court refused to speculate whether, "[h]ad she been able to have a hearing short of the six months," the JDR court would have resumed visitation before then. In sum, the circuit court found that mother's actions were the reason she did not have contact with J.H. for more than six months before the adoption petition.

6

The circuit court noted that, while the case was pending, mother did get visitation again for a period of time, but it was suspended again based on mother's behavior. By the date of the hearing, the circuit court found mother had been away from J.H. for 15 months due in part to a felony distribution act she committed which landed her in jail. Concluding it should be able to consider that additional time, the circuit court opined that, if the reverse were true, "then, basically, what you're saying is, I would have to dismiss this petition, they'd re-file based on the fact that [mother] hadn't had contact for over six months based on her new actions, and I don't think that's at all what the statute contemplates." The circuit court further stated that "the whole idea behind this adoption statute is to have some security and some stability for the child."

Following the circuit court's denial of her motion to strike, mother put on evidence. First, J.H.'s 13-year-old half-sister testified that J.H. was her best friend and that they did everything together. She said she had been to some of the supervised visits with J.H. and mother, and she reported that they were "good" and that she "had a lot of fun." She said mother and J.H. played together with toys and board games, that J.H. and mother hugged as soon as they got to the visits, and that they hugged again when leaving. Loretta Baldwin, a DSS employee who supervised mother's visitations, testified that mother was very good with J.H., they played together, and mother always brought something for J.H. to play with. J.H.'s preschool teacher also testified that J.H. and mother had a good relationship.

After mother rested, J.H.'s GAL gave her report. She stated that she had observed "issues" during the supervised visitations between mother and J.H. and that J.H.'s counselor had spoken to her about problems that arose during that time. The GAL stated that she had gone out of her way to get mother on board with re-establishing meaningful contact with J.H., but her efforts failed. The GAL then confirmed that J.H. had lived with father and stepmother for four

7

years and was doing extremely well. She said J.H. viewed stepmother as her mother figure and that J.H. was thriving in a stable situation that did not exist when she was with her mother. The GAL recommended that the circuit court grant stepmother's petition for adoption.

Stepmother argued that sufficient evidence established that Code § 63.2-1202(H)'s requirements had been met, and therefore, mother's consent was not required. If the circuit court disagreed regarding Code § 63.2-1202(H), stepmother argued that there was no question that mother was withholding consent contrary to the best interests of J.H. Mother countered that stepmother failed to meet her burden to establish by clear and convincing evidence that mother, without just cause, failed to contact J.H. for a period of six months immediately prior to filing the petition. Specifically, mother claimed she had just cause—contracting COVID and her attorney being called to the General Assembly—for failing to maintain contact with J.H. while her motion to amend the protective order was outstanding. Further, mother claimed adoption was not in the best interests of J.H. because it would forever terminate mother's parental rights and forever sever J.H.'s ability to maintain relationships with biological family members.

The circuit court approved the adoption, ruling that mother's consent was not required under the circumstances. It found there was "no question that [mother] went more than six months without having any contact with her child," noting several factual findings in support of its ruling. First, the circuit court recognized that mother's motion for visitation was filed months after the protective order was issued, and COVID had nothing to do with that delay. Moreover, after filing the motion, mother was unresponsive to drug screening requests until January 29, 2021.

In its written final order of adoption, the circuit court reiterated:

> [W]hen this Petition was filed on 13 April 2021, the birth mother, Lindsey Nicole Perkins, had not visited with the minor child since

8

at least 3 July 2020, a period in excess of 9 months; and . . . although she did resume court ordered supervised-only visitation by Order of the Tazewell County Juvenile and Domestic Relations Court entered on 27 April 2021, after multiple hearings in the Tazewell County Juvenile and Domestic Relations Court, the Child Protective Order which had been in effect from 10 July 2020 until 27 April 2021, forbidding all contact of birth mother with child, was reentered and remains in full force and effect to date, and birth mother has had no contact with child from 13 March 2022, a period in excess of 15 months, and pursuant to §63.2-1202(H) of the Code of Virginia, her consent shall not be required[.]

Mother appealed to the Court of Appeals. The Court of Appeals observed that Virginia courts have yset to define "just cause" as used in Code § 63.2-1202(H) and recognized that the phrase is "difficult to define with precision." *Perkins v. Howington*, 82 Va. App. 1, 9 (2024). Citing definitions of the phrase adopted in other states with similar statutory schemes, the Court of Appeals concluded that "just cause" for the purpose of Code § 63.2-1202(H) means that the failure to visit or contact the child was caused by circumstances beyond the control of the birth parent. *Id.* at 10. Recognizing that mother's failure to either visit or contact J.H. in the statutory period was the result of the existence of the July 14 no contact order, the Court of Appeals affirmed the circuit court's finding that the lack of a visit or contact was without just cause "because mother's own actions led to the July 14 protective order," and therefore, the lack of contact was something that had been within mother's control. *Id.* at 11.

Mother appealed to this Court. She argues that her failure to visit or contact the child in the six-month period was the result of her obeying the order of the JDR court that she have no contact with the child. She also notes that, during the statutory six-month period, she engaged in lawful efforts to have the no contact order lifted. She contends that "actively availing herself of the court's remedies, while obeying the court's order surely must qualify as 'just cause'" for the purpose of Code § 63.2-1202(H).

## II. ANALYSIS

A. Standard of review

In appealing the judgment of the Court of Appeals, mother seeks to overturn the final order of adoption entered by the circuit court. In Virginia "the entire field of adoption is covered by statute." *Fletcher v. Flanary*, 185 Va. 409, 412 (1946); *see also Berry v. Barnes*, 72 Va. App. 281, 287 (2020) ("Adoption in Virginia is solely a creature of statute.") (internal quotation marks and citations omitted). To the extent that resolution of an adoption appeal depends upon the interpretation of one of the adoption statutes, it raises a question of law that we review de novo. *Berry*, 72 Va. App. at 288.

Although we determine the meaning of the adoption statutes de novo, the effect of those statutes often will turn on the specific facts or the balancing of various statutory standards or factors. When the outcome in an adoption case turns on such factual determinations or balancing, "[t]he discretion to make the relevant determinations is vested where the judicial branch comes into the closest contact with the child, the biological parents, and the prospective adoptive parents—the circuit court." *Geouge v. Traylor*, 68 Va. App. 343, 372 (2017).

Accordingly, because the circuit court heard evidence regarding the adoption petition, we defer to the circuit court's factual findings so long as they are not "plainly wrong or without evidence to support" them. *Dyer v. Howell*, 212 Va. 453, 458 (1971); *see also T.S.G. v. B.A.S.*, 52 Va. App. 583, 588-89 (2008). Similarly, we will not substitute our judgment for that of the circuit court on any matters that the adoption statutes commit to the circuit court's discretion unless we conclude that the circuit court abused that discretion. *Geouge*, 68 Va. App. at 372.

B.  Adoption, parental consent, and Code § 63.2-1202(H)

Absent a statutory exception, a birth parent whose parental rights previously have not been terminated must consent to an adoption in Virginia.  Code § 63.2-1202(A).  One such exception to the parental consent requirement is found in Code § 63.2-1202(H), which provides that

> [n]o consent shall be required of a birth parent who, without just cause, has neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption or the filing of a petition to accept consent to an adoption.  The prospective adoptive parent(s) shall establish by clear and convincing evidence that the birth parent(s), without just cause, has neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption or the filing of a petition to accept consent to an adoption.  This provision shall not infringe upon the birth parent's right to be noticed and heard on the allegation of abandonment.  For purposes of this section, the payment of child support, in the absence of other contact with the child, shall not be considered contact.

By its express terms, Code § 63.2-1202(H) requires a prospective adoptive parent or parents to establish two distinct elements: first, that the birth parent "has neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption or the filing of a petition to accept consent to an adoption[,]" and second, that any such six-month period without a visit or contact occurred "without just cause[.]"  A failure of a prospective adoptive parent or parents to establish either element precludes a circuit court from granting an adoption without consent under the auspices of Code § 63.2-1202(H).

In this case, the circuit court concluded that the prospective adoptive parent had established, by clear and convincing evidence, both that mother "neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption or the

11

filing of a petition to accept consent to an adoption," *id*., and that mother's failure to maintain

contact in that period was "without just cause[.]" *Id*. We now address each of those conclusions.

1. Neither visited nor contacted

We previously considered Code § 63.2-1202(H)'s failure to visit or contact provision in

*Copeland v. Todd*, 282 Va. 183 (2011). Finding the language clear and unambiguous, we noted

that the statutory language limits a court's inquiry to the binary question of whether or not a birth

parent had visited or contacted the child in the six months immediately preceding the filing of the

petition seeking adoption.[3] *Id*. at 194. In determining whether there has been a visit or contact

in the statutory six-month period, the statutory language does not permit a court "to evaluate the

quality and value of time spent between a birth parent and child[,]" *id*., or inquire as to whether

there were visits or contacts before or after the statutory six-month period. The language of this

specific statutory element limits the inquiry to the binary, objective question of whether there has

been a visit or contact in the six months immediately preceding the filing of the adoption

petition—either there has or there has not. In this way, the six-month statutory element is the

classic legal "rule." *Cf. Welsh v. Commonwealth*, 304 Va. 118, 141 (2025) ("Rules favor

objective criteria that allow for . . . straightforward application.").

---

[3] In 2012, after our decision in *Copeland*, the General Assembly amended Code § 63.2-1202(H) but did so in a way that affirmed our interpretation of the lack of visit/contact provision. The version of the statute at issue in *Copeland* did not include the word "immediately" in describing the time period to be considered. We interpreted the phrase "prior to," which was in the statute, as meaning that the time period to be considered was the six months *immediately* preceding the filing of the petition. The 2012 amendment confirmed this understanding by adding the word "immediately" before "prior to[.]" *See* 2012 Acts ch. 424 ("No consent shall be required of a birth parent who, without just cause, has neither visited nor contacted the child for a period of six months *immediately* prior to the filing of the petition for adoption[.]") (emphasis added).

Applying this objective legal rule to the facts of this case, it is clear that the circuit court did not err in concluding that mother had neither visited nor contacted J.H. in the six months immediately preceding the filing of the adoption petition. The adoption petition was filed on April 13, 2021, meaning that stepmother had to establish that mother had neither visited nor contacted J.H. after October 13, 2020. It is undisputed that mother neither visited nor contacted J.H. between the JDR court's July 14, 2020 no contact order and the filing of the adoption petition nine months later. Because the undisputed facts establish that, as a matter of objective fact, mother neither visited nor contacted J.H. in the six months immediately preceding the filing of the adoption petition, neither the circuit court nor the Court of Appeals erred as regards Code § 63.2-1202(H)'s six-month element.

Acknowledging that she neither visited nor contacted J.H. in the six months immediately preceding the filing of the adoption petition, mother's appeal primarily focuses on the second element stepmother was required to establish—that the admitted lack of a visit or contact was "without just cause[.]" Code § 63.2-1202(H). Mother argues that the lack of a visit or any contact was the result of her being ordered to have no contact and that "[t]here can be no better example of 'just cause' than obeying a court order to have no contact." We now turn to the question of what constitutes "just cause" for the purpose of Code § 63.2-1202(H).

2. Without just cause

Once it has been established that a birth parent has neither visited nor contacted a child in the six months preceding the filing of an adoption petition, Code § 63.2-1202(H)'s "just cause" provision requires a court to first ask the question why—why has the parent neither visited nor contacted his or her child over the six-month period? Having determined the "why," a court then

13

must determine whether that reason is justified, with the prospective adoptive parent bearing the burden of establishing that it is not.

As the Court of Appeals observed, the phrase "just cause" is "difficult to define with precision." *Perkins*, 82 Va. App. at 9. This difficulty stems from the fact that, unlike Code § 63.2-1202(H)'s six-month provision, the "just cause" provision sets forth a standard rather than a legal rule. Because Code § 63.2-1202(H)'s "just cause" provision is best understood as a legal "standard," it "leaves many application-related details unresolved." *Welsh*, 304 Va. at 141 (quoting Michael Coenen, *Rules Against Rulification*, 124 Yale L.J. 644, 652 (2014) (footnotes omitted)). In general, it is not an objective inquiry, but rather requires the application of at least some subjective judgment.

Recognizing that Code § 63.2-1202(H)'s "just cause" element represents a legal standard as opposed to a rule has significant implications for how a circuit court should approach the question and how appellate courts review the circuit court's resulting conclusion. Given the subjective and open-ended nature of the inquiry, a circuit court should consider all potentially relevant facts and circumstances that might explain the birth parent's failure to contact or visit the child. This certainly will include events that occur prior to the six-month period because knowledge of those events likely is necessary to determine why there has been neither a visit nor contact in the six-month period, let alone whether the reason is justified. It may even include events that occur after the six-month period; not because those events caused the lack of a visit or contact, but because those events may foster a better understanding as to why there was no visit or contact by placing that circumstance into the context of the relationship. In short, the statutory "just cause" standard will render many things relevant, even if those things are not necessarily dispositive.

The General Assembly's adoption of the "just cause" standard in Code § 63.2-1202(H) also affects how reviewing courts must treat the decisions made by circuit courts. The subjective nature of the standard necessarily means that the circuit court has been granted a measure of discretion in determining whether the standard has been met. *Cf. Wynnycky v. Kozel*, 71 Va. App. 177, 200 (2019) ("By its very nature, . . . a legal standard is not amenable to the creation of hard and fast rules, but rather, confers discretion upon the decision maker.").

In this way, the "just cause" standard in Code § 63.2-102(H) is like many provisions in Virginia's statutory adoption scheme; "[t]he discretion to make the relevant determinations is vested where the judicial branch comes into the closest contact with the child, the biological parents, and the prospective adoptive parents—the circuit court." *Geouge*, 68 Va. App. at 372. Accordingly, we will reverse a circuit court's determination regarding just cause under Code § 63.2-1202(H) only if it constitutes an abuse of discretion, which "occurs only when 'reasonable jurists' could not disagree as to the proper decision." *Id*. at 370 (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)).

Applying this understanding to the facts of the case leads to the conclusion that the circuit court did not abuse its discretion in concluding that the lack of a visit or any contact was without just cause, and therefore, that the Court of Appeals did not err in affirming that judgment. It is undisputed that mother's actions caused the no contact order to be put in place. The no contact order stemmed from a finding that mother, due to her problems with drug use and abuse, had abused and neglected J.H. Absent such abuse and neglect by mother, the no contact order does not come into existence. Thus, even though mother was barred from having contact or visiting the child by court order, mother was the ultimate cause of that order being in place.

The fact that a birth parent's failure to visit or even contact a child in the six-month period is the result of a no contact order arising from the birth parent's own misconduct can provide a sufficient basis for a circuit court to conclude that the lack of a visit or contact in the statutory six-month period was "without just cause[.]" Code § 63.2-1202(H). The Court of Appeals, however, went one step further—effectively adopting a *per se* rule that a lack of a visit or contact as a result of a no contact order always will render the lack of a visit or contact as being without just cause. *Perkins*, 82 Va. App. at 10-11.

In attempting to engraft a bright-line rule onto Code § 63.2-1202(H)'s "just cause" standard, the Court of Appeals erred in its reasoning. As noted above, the application of a standard like the "just cause" standard simply "is not amenable to the creation of hard and fast rules," *Wynnycky*, 71 Va. App. at 200, like the one the Court of Appeals adopted here. Although the Court of Appeals' desire for a certain definition that can be mechanistically applied was well-intentioned, it cannot be reconciled with a proper reading of the "just cause" standard, which requires a consideration of all of the facts and circumstances.

As mother argues, the existence of the no contact order was a part of the story, but the circuit court needed to consider the rest of the story, which included her efforts to have the no contact order set aside. The record reflects that the circuit court did so, considering the history of the no contact order and mother's less-than-diligent efforts to have it set aside.

The record reflects that mother did not immediately attempt to set aside the no contact order, making no motion for modification or dissolution when the no contact order first came up for review on August 18, 2020. Evidence also established that once mother did begin efforts to set aside the no contact order, she did not pursue those efforts diligently. In January 2021, during the six-month statutory period, she was ordered to file a bill of particulars regarding her

efforts to have the no contact order modified or set aside. She never complied with the order to do so.

In addition to mother failing to diligently pursue modification of the no contact order, evidence amply supported a conclusion that mother's substance abuse issues, the genesis of the abuse and neglect finding that gave rise to the no contact order, continued to exist. Viewing the record in the light most favorable to stepmother, evidence established that mother continued to fail or miss drug screenings. Given the central nature of mother's drug issues to the no contact order, the circuit court was free to draw negative inferences from the failed and/or missed screenings.

In short, although the Court of Appeals erred in crafting a *per se* rule, the circumstances here amply supported the circuit court's conclusion that mother's failure to visit or contact J.H. during the statutory six-month period was "without just cause[.]" Code § 63.2-1202(H). The no contact order was the result of mother's conduct, specifically her abuse and neglect of the child related to her continued drug use/abuse. Mother's less-than-diligent attempts to set aside the no contact order, while relevant, certainly do not compel the conclusion that mother's failure to visit or contact the child was justified. Furthermore, the record supports the conclusion that mother continued to have issues with drug use/abuse—the very reason for the no-contact order—before, during, and after the statutory six-month period. Given all of these facts and circumstances, a reasonable jurist could conclude that mothers' failure to visit or contact J.H. during the statutory period was not justified. Accordingly, we cannot say the circuit court abused its discretion in so concluding, and therefore, the Court of Appeals, even if its reasoning was erroneous, correctly affirmed the judgment of the circuit court.

17

## III. CONCLUSION

For the reasons stated above, the circuit court did not err in concluding that, pursuant to Code § 63.2-1202(H), mother's consent was not required for the adoption to move forward. Accordingly, we affirm the judgment of the Court of Appeals.

*Affirmed*.